# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> RAYMOND LIDDY, <br><br> Defendant. | Case No.: 17cr2475-CAB <br><br> **ORDER ON MOTION TO SUPPRESS [Doc. No. 84]** |

Defendant Raymond Liddy is charged with a violation of Section 2252(a)(4)(B) of Title 18 of the United States Code. [Doc. No. 13.] Before the Court is the defendant's motion to suppress statements he made to law enforcement. [Doc. No. 84.] The government filed a response in opposition. [Doc. No. 98]. Defendant filed a reply. [Doc. No. 105.] The Court heard argument on May 2, 2019. [Doc. No. 106.] The parties were granted leave to submit additional exhibits for the Court's consideration. [Doc. Nos. 107, 108.] Having considered the briefs, the arguments of counsel and the additional materials, the motion to suppress is DENIED.

I. Factual Background

On the morning of July 25, 2017, at 7:00 a.m., three officers (FBI Special Agents Daniel Evans and Nathaniel Dingle, and SDPD Detective Susan Righthouse), arrived at

Raymond Liddy's home.[1]  The officers were wearing tactical vests and had visible holstered firearms.  They rang the bell.  Liddy was awake and came to the door wearing shorts and a t-shirt.  Agent Evans inquired if the defendant was Raymond Liddy.  The agent then identified himself and his colleagues and asked if Liddy "had a minute to speak with them."  When Liddy inquired what about, Agent Evans asked if they could speak inside.  Liddy allowed the officers to enter his home and informed the officers his wife was asleep upstairs, so Agent Evans said they would "keep it down."  After inquiring if there were any children in the home, Agent Evans informed Liddy they were following up on information regarding computer usage and concerns about emails.  Liddy then asked to move the conversation to the "back of the house" and the three officers accompanied Liddy to the kitchen to talk.

As they sat in the kitchen, Agent Evans explained that they were investigating an email account that came back to the defendant's house with an account identifier "cahubby."  Agent Evans indicated they were following up on concerns about questionable photos.  Agent Evans and Liddy discussed Liddy's computer usage, an adult website and photos on the website.  The discussion continued about pictures on the site and how Liddy may have received them, whether his chat site conversations involved children, and any other computer accounts he may have.

Agent Evans did not directly accuse Liddy of anything but inquired if Liddy may have accidently received or sent pictures involving children.  Agent Evans asked if Liddy had saved any pictures of children.  He also inquired about the type of computer Liddy owns and whether Liddy ever had chats about children.  Agent Evans asked again about whether Liddy had other accounts or screen names, and whether Liddy alone used the "cahubby" screen name.

---

[1] The Court finds the facts as set forth from a review of the audio recordings made on July 25, 2017, the reports filed with the motions, the defendant's declaration, and the post-hearing lodgments submitted by counsel.

After approximately 25 minutes, Agent Evans went on to explain that certain service providers had reported email exchanges on accounts associated with Liddy and they needed to "get to the bottom of it." He expressed concern about a pattern of behavior that was troubling and pressed Liddy to explain the nature of his interest regarding child pornography. Agent Evans and Liddy then discussed whether a forensic examination of Liddy's computer would uncover stored or deleted pictures involving children or requests for such images.

No threats were ever issued, no promises were made, no weapons were unholstered or brandished or force even implied. Agent Evans never raised his voice, the tone and tempo of the interrogation was polite, calm, hushed and conversational. Excepting one question from Detective Righthouse about cloud storage, she and Agent Dingle did not participate in the conversation.

Approximately 35 minutes after the officers arrived, following the above exchange, Agent Evans explained that he had a warrant to search the entire house and additional agents would arrive shortly to conduct the search. The interrogation essentially ended at this point before the search team arrived. Agent Evans told Liddy he was not under arrest, he was free to leave, although Liddy would not be permitted to change clothes until the house was "cleared."

Agent Evans suggested Liddy wake his wife so she would not be alarmed by the arrival of the search team. Upon learning, however, that Liddy had firearms in the master bedroom, Agent Evans required for the safety of all concerned that Detective Righthouse accompany Liddy into the room and remain with Mrs. Liddy while she dressed. Liddy and Agent Evans returned downstairs and Agent Evans asked Liddy where he would like to sit to stay out of the way. Liddy got his coffee and returned to the kitchen. At approximately 7:47 a.m., as the search team was entering, Agent Evans provided Liddy with a copy of the warrant and again told him he did not have to stay during the search.

Liddy elected to stay during the search. Although Liddy was always in the company of an officer while he remained in the house, no further questions were directed

3

to him regarding his computer usage or habits. Liddy made some unsolicited comments about his computer habits, but Agent Evan's interrogation had discontinued. Further interactions between the officers and Liddy were primarily related to the conducting of the search of the premises. Subsequent conversations focused on the logistics of securing Liddy's firearms, confirming if there was any attorney-client privileged information on Liddy's computer or phone to safeguard those communications, and whether Liddy would voluntarily come to the FBI office to submit to a polygraph concerning whether he had any inappropriate contact with children.[2] Liddy was told he did not have to stay but continued to elect to do so and arranged to take a sick day from work. An officer made the electronic communication to Liddy's office on his behalf rather than give Liddy access to his phone, to preserve the phone for later search.

Shortly after 9:00 a.m., Agent Evans informed Liddy that child pornography images had been located on a thumb drive and although it was still not his intention to place Liddy under arrest at that time, he gave *Miranda* warnings to Liddy, who acknowledged he understood all his rights. Although the agent downplayed the seriousness of the situation, Liddy's rights were clearly presented. Discussion then continued about Liddy driving himself to the FBI office to participate in a voluntary polygraph. While those arrangements were being finalized, Agent Evans was informed that the U.S. Attorney's Office had instructed he take Liddy into custody. At approximately 10:15 a.m., Liddy was told he was being arrested and was handcuffed and transported to the FBI office in San Diego.

Liddy moves to suppress all the statements he made on July 25, 2017, arguing that from the time the officers entered his home he was subject to a custodial interrogation and he should have been informed of his rights before any questions were asked. Liddy

---

[2] Further reflecting the cooperative atmosphere, Liddy also engaged with the officers during the execution of the search, in conversation about his new kitten, the nature of his job at the Attorney General's Office, and his military service.

4

further argues that the *Miranda* advisements he received after the interrogation were ineffective as Agent Evans engaged in a deliberate "two-step interrogation procedure" intended to elicit inculpatory statements before the defendant was advised of his rights and the subsequent advisal did not correct the situation.

The question before the Court is whether Liddy was "in custody" for purposes of *Miranda* at the time he was interviewed by law enforcement agents in his home.

II. Legal Standard

In *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966), the Supreme Court adopted procedural safeguards to guarantee that suspects are advised of certain rights before a "custodial interrogation." In "*Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). "The initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.*, at 509 (citations omitted).

In *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), the court specifically addressed the circumstance of interrogation by law enforcement officers in the suspect's home and when such questioning becomes custodial in nature and requires *Miranda* warnings. The court first stated that in-home interrogation is not *per se* custodial and that in general courts have been much less likely to find an interrogation in the suspect's home was custodial in nature. *Id.*, at 1083. "The element of compulsion that concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings." *Id.*

The court nevertheless determined that an interrogation in the suspect's home may be found to be custodial under certain circumstances and considered the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a "police-dominated atmosphere." *Id.* To guide the determination of whether an in-home interrogation was custodial, a "necessarily fact

17cr2475-CAB

intensive" inquiry, the court enunciated several factors, that although "not to be interpreted as an exhaustive pronouncement," are relevant to whether the circumstances of an interrogation created a police-dominated atmosphere. *Id*. at 1084.

The *Craighead* factors are (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was an any point restrained either by physical force or threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. *Id.*

III. Discussion

The totality of the circumstances in this case are distinguishable from those in *Craighead* and do not support the conclusion that law enforcement had created such a police-dominated atmosphere in Liddy's home that Liddy was "in custody" at the time of Agent Evan's interrogation therefore requiring Miranda warnings before the questioning took place.

In *Craighead*, eight law enforcement officers from the FBI, a sheriff's department and Air Force Special Investigations, accompanied by the defendant's Air Force superior, entered Craighead's house on a military base pursuant to a search warrant. *Id*., at 1078. The officers were armed, and some unholstered their firearms in the defendant's presence. *Id.,* at 1085. The defendant was escorted into an unfurnished storage room with a single door. The door was closed and the defendant was questioned by an FBI agent while an armed detective stood with his back against the door and six more officers were searching the house. *Id,*, at 1086, 1089. The Air Force Sergeant who was specifically there to provide "emotional support" for the defendant was excluded from the room where the interrogation took place. *Id*., at 1087. Although the defendant was told by the FBI agent his statements were voluntary and he could leave, the court found the totality of the circumstances were such that the defendant reasonably could have believed he was not free to leave or decline to be interviewed. Craighead's home had become a police-dominated atmosphere such that a reasonable person would have felt he was in

6

custody and was not at liberty to terminate the interrogation and leave. As such the court concluded *Miranda* warnings should have been administered before he was questioned.

The circumstances of this case are quite different. Although a large search team eventually arrived at defendant Liddy's home that morning, unlike Craighead, Liddy was not initially confronted with a swarm of officers entering his home without his permission and dominating the environment. Liddy answered his door bell to find three officers who asked if he would speak with them. Liddy invited them into his home and he directed the officers to his kitchen. During the 35 minutes that followed, Liddy answered Agent Evans' questions regarding his computer usage, habits and activities. There was no other police presence and Liddy was not aware that a warrant had issued and a search was imminent.

The three officers were armed, however, no weapons were drawn and Liddy was never restrained by physical force or intimidation during the questioning. Liddy was not isolated from others. He requested the officers not disturb his wife and moved the conversation to the kitchen to avoid waking her. Although he was not specifically told he could terminate the interview, he also was never told, nor was it ever implied, that he would be subject to arrest if he asked to continue the interview to another date or terminate it entirely.

The setting does not become custodial requiring the administration of *Miranda* warnings simply because Agent Evans suspected Liddy of criminal activity. Although "any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime," that alone is insufficient to render the questioning custodial. *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977). Liddy was never threatened with criminal charges or arrest if he did not cooperate. At the time of the interrogation, his home had not become police-dominated atmosphere such that a reasonable person would have considered himself in custody,

7

17cr2475-CAB

unable to terminate the interview or ask the officers to leave. *Miranda* warnings were not required.

Defendant focuses on the atmosphere in Liddy's home during the search following Agent Evans' interrogation. To be sure, for safety and the preservation of evidence, Liddy was not allowed to move unescorted around his home during the execution of the search. However, the control law enforcement exercised once the search began, is not a factor in the analysis of the atmosphere when the interrogation took place. From 7:00 a.m., when Liddy allowed the three officers into his home to the conclusion of the interview at approximately 7:35 a.m., the atmosphere was not one of police dominance and coercion. The record does not support defendant's assertion that comprehensive questioning of Liddy continued for over two hours. To the contrary, even before the search began, interrogation of Liddy ceased. Discussion between Liddy and officers once the search ensued was confined to the search-related procedures regarding his firearms and attorney-client files, and whether he would voluntary submit to a polygraph at the FBI office,[3] as well as small talk about Liddy's kitten, job and military service.

Liddy was not in custody during his interrogation, therefore no *Miranda* warnings were required. Defendant's motion to suppress his pre- and post- *Miranda* statements is **DENIED**.

Dated: May 14, 2019

Hon. Cathy Ann Bencivengo
United States District Judge

---

[3] The fact the Liddy was arranging to drive himself to the FBI office undercuts his current declaration that he felt he was in custody, unable to leave the premises without being subject to arrest.